1
2
3
4
5
6
7
8

## UNITED STATES DISTRICT COURT

9

## SOUTHERN DISTRICT OF CALIFORNIA

10
11    ARCHITECTUREART, LLC,                    Case No. 15-cv-1592-BAS-NLS
12                           Plaintiffs,       **ORDER GRANTING
                                               DEFENDANT CITY OF SAN
13            v.                               DIEGO'S MOTION FOR
                                               SUMMARY JUDGMENT**
14    CITY OF SAN DIEGO,
15                           Defendant.
16
17
18          The City of San Diego ("City") brings this Motion for Summary Judgment

19    against ArchitectureArt LLC ("AArt" or Plaintiff).  (ECF No 20.)  The City argues:

20    (1) Plaintiff lacks standing to challenge the City's sign ordinance in its entirety; (2)

21    Plaintiff's First Amendment claims should be dismissed because the code sections at

22    issue (a) are not vague, (b) are content neutral as applied to Plaintiff and do not

23    unconstitutionally distinguish between different mediums or speakers, or between

24    commercial and non-commercial speech, (c) do not give the City unbridled

25    discretion, and (d) do not subject Plaintiff to an unconstitutional prior restraint on

26    speech; (3) Plaintiff's Equal Protection claims fail because Plaintiff does not present

27    any evidence that Comic-Con approved artists were treated differently than Plaintiff;

28    (4) Plaintiff's Due Process claims fail because there is no evidence of delegation of

municipal powers to Comic-Con or Civic San Diego and Plaintiff's permits were denied under a constitutional sign ordinance; and (5) Plaintiff's Intentional Interference with Prospective Business Advantage claims fail because Plaintiff was engaged in an illegal business.

The Court **GRANTS** the City's Motion for Summary Judgment, finding there is no genuine issue of fact with respect to the alleged constitutional violations and, therefore, the claim for intentional interference with prospective business advantage must also fail.  In light of this ruling, the court holds the issue of standing is moot.

# I.     STATEMENT OF FACTS

## A.  The Sign Ordinance

The San Diego sign ordinance at issue regulates signs visible from the public right-of-way.  The express intent of these ordinances is to "optimize communication and quality of signs while protecting the public and the aesthetic character of the City."  SDMC §142.1201.  The sign ordinances apply only to City-owned property and not to property controlled by the San Diego Port District or the San Diego Trolley. (Declaration of Michael Richmond, ECF No. 50-3 ("Richmond Decl.") ¶12.)  The San Diego Port District controls the San Diego Convention Center and much of the property south of the trolley tracks along Harbor Drive, including the Marriott and Hilton San Diego Bay hotels. (*Id.*)

All signs on City-controlled property must receive a permit from the City. SDMC §142.1205.  Signs may contain "on-premises or public interest messages only."  SDMC §142.1210(a)(1).  "On-premises messages" are defined as "those identifying or advertising an establishment, person, activity, goods, products, or services located on the premises where the sign is installed."    SDMC §142.1210(a)(1)(A).

"Public interest messages" include (1) "official signs and notices, including historical markers and commemorative plaques," (2) signs and notices identifying "nonprofit service clubs, religious organizations or charitable associations" and

1  containing information relating to those organizations' activities;  and (3) "political

2  or ideological signs" related either to a local election issue or candidate, or expressing

3  ideological or political views.  SDMC §142.1210(a)(1)(B).

4  Exempted from this sign ordinance and the need to obtain a permit are

5  "[p]ainted graphics that are murals, mosaics, or any type of graphic arts that are

6  painted on a wall or fence and do not contain copy, advertising symbols, lettering,

7  trademarks, or other references to the premises, products or services that are provided

8  on the premises where the graphics are located or any other premises."  SDMC

9  §142.1210(a)(3).

10  Both Lorena Cordova from Civic San Diego and Karen Maillet from the City

11  interpret the mural exception as any painted art that is not advertising.  (Declaration

12  or Karen Frostrom ("Frostrom Decl."), Exh. I, ECF No. 21-3) (Email from Lorena

13  Cordova stating that the idea behind a mural is that it is not an advertising mechanism,

14  otherwise it's considered signage); (Frostrom Decl., Exh. J, ECF No. 21-3, p. 34:3–

15  7) (a mural is "something that doesn't reflect any type of business activity that would

16  be going on at that location or off premise.")

17  Any citation for a violation of the sign ordinance is appealable and a cited

18  individual may request a hearing before an Administrative Enforcement Hearing

19  Officer.   SDMC §§12.0501-0502, 12.0401-0413. After this hearing before an

20  Administrative Enforcement Hearing Officer, the cited individual may seek further

21  appellate review to the San Diego Superior Court by way of a writ of mandate.  Cal.

22  Civ. Proc. §1094.6.  Similarly, an individual may appeal the denial of a sign permit

23  and may eventually seek judicial review to the Superior Court by way of writ of

24  mandate.  SDMC §129.0809; Cal. Civ. Proc. §1094.8.

25  **B. Plaintiff's Signs**

26  AArt is an outdoor mural company that does business in San Diego.  (Joint

27  Statement of Undisputed Facts, ECF No. 24 ("JSUF") ¶1.)  Pamela Anderson is the

28  owner and manager of AArt. (JSUF ¶2.)  AArt obtained leases from various buildings

– 3 –

1   throughout San Diego for the purpose of painting signs/murals.[1] (JSUF ¶5.)

2       After obtaining the leases, Anderson contracted with companies to post large

3   signs/murals on the buildings.  (JSUF ¶6.)  The City cited eleven of these signs as

4   violating the City's sign ordinance.  (JSUF ¶8.)   One of these signs (Discover Los

5   Angeles) was approved as a mural exception to the sign ordinance once AArt painted

6   out the words "Los Angeles" on the mural.  (Frostrom Decl., Exh. I, ECF No. 21-3.)

7   The decision to approve the "Discover Los Angeles" sign after removal of the words

8   was made by Lorena Cordova, an Assistant Planner with Civic San Diego. (*Id*.)  Two

9   of the murals (Shock Top and Michelob Ultra) received permits that were later

10  rescinded.  (JSUF ¶¶10, 11.)   One mural (Blue Moon) received approval, but the

11  permit was denied before issuing.  (Declaration of Catherine Richardson, ECF No.

12  20-8 ("Richardson Decl."), Exh. 3, pp. 55–58.)

13      **C.  Comic-Con**

14      AArt alleges that Comic-Con received special treatment with respect to signs

15  in San Diego.[2] Plaintiff attaches examples of large signs on the sides of buildings

16  posted during Comic-Con without permits.   (Declaration of Pamela Anderson

17  ("Anderson Decl."), Exhs. GGGG-VVVV, ECF Nos. 21-10, 21-11.)  It is unclear

18  whether these signs are on San Diego Port Commission property or City property,

19  although some of the signs are clearly on the Convention Center and the Marriott,

20  which are Port Commission property.  The signs are clearly advertising.  Although

---

[1] "Murals" have a special definition under the San Diego Municipal Code.  To the extent the Court uses the word "mural" or "sign", the Court is not intending the special definition adopted by the City of San Diego, but simply the generic definition of "murals" or "signs".

[2] Plaintiff was allowed to supplement the record to provide evidence of this special treatment. Instead Plaintiff attaches 544 pages of emails, letters and news articles, the vast majority of which have nothing to do with the sign ordinance.  "The district court may limit its review to documents submitted for the purpose of summary judgment and those parts of the record specifically referenced therein." *Carmen v. San Francisco Unified Sch. Dist.,* 237 F.3d 1026, 1030 (9th Cir. 2001).  The court is not obligated "to scour the record in search of a genuine issue of triable fact." *Keenan v. Allen,* 91 F.3d 1275, 1279 (9th Cir. 1996) (citing *Richards v. Combined Ins. Co. of Am.,* 55 F.3d 247, 251 (7th Cir. 1995)).

both the Motion for Summary Judgment and Response discuss the City's use of "Temporary Use Permits" (T.U.P.s), there is no evidence that Comic-Con had a T.U.P. with respect to the sign ordinance. (Frostrom Decl., Exh. H, ECF No. 21-2, pp. 98-99.)

The City does not proactively enforce violations of the sign ordinance. (Richardson Decl., Exh. 4, p. 64.)  Unless the violation is egregious, generally the City just responds to complaints filed.  (*Id*.)  Anyone in the general public can register a complaint.  (*Id*. at p. 65.)  Employees with the City were given discretion in how to deal with code violations.  (Frostrom Decl., Exh. K, ECF 21-3, p. 23.)  Part of Lorena Cordova, at Civic San Diego's, ministerial duties is sign enforcement.  (Frostrom Decl., Exh. MM, ECF No. 21-4, p. 87.)  She also processes T.U.P.s (*Id*. at p. 88.)

Plaintiff asserts that the City let Comic-Con violate the sign ordinance at will, and that Comic-Con charged other individuals for the privilege of having the City look the other way on sign ordinance violations.  The only evidence Plaintiff adduces in support of this theory are hearsay statements.   First, Pamela Anderson says someone in the City Records department named "Lorena" told her "the City lets Comic-Con do what it wants" (Declaration of Pamela Anderson, ECF No. 51-18 ("Anderson Decl.") ¶4).  Next, Plaintiff attaches an email from Ms. Anderson dated June 20, 2012, purporting to confirm a telephone conversation Anderson had with Damien from Comic-Con.[3]  (Exh. PPPPP, ECF No. 51-9.)

According to the email appearing to be from Ms. Anderson to Damien, Damien told her that Comic-Con and the City found a way to get around sign ordinances for signs at the convention center and other hotels, and that he would ensure that the City would not interfere with her sign at the Embassy Suites if she paid Comic-Con a flat fee of $20,000.  (*Id*.)  Finally, Plaintiff cites the opinion of someone from Launch

---

[3] In its Supplemental Briefing, Plaintiff attaches numerous Exhibits without clarifying to what these Exhibits are attached.

Point Marketing (not from the City or from Comic-Con) who opines that "Comic-Con basically owns the city that week [of Comic-Con] and no additional permits are needed." (Exh. XXXX, ECF No. 51-1.)

## II. ANALYSIS

### A. Standard

Summary Judgment is appropriate under Rule 56(c) when the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is material when, under the governing substantive law, it could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

A party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. The moving party can satisfy this burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *Id.* at 322-23. "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

If the moving party meets this initial burden, the nonmoving party cannot defeat summary judgment merely by demonstrating "that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995) ("The mere existence of a scintilla of evidence in support of the nonmoving party's position is not sufficient.") (citing *Anderson*, 477 U.S. at 252).

Rather, the nonmoving party must "go beyond the pleadings" and by "the depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)).

When making this determination, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmoving party. *See Matsushita*, 475 U.S. at 587. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, [when] he [or she] is ruling on a motion for summary judgment." *Anderson*, 477 U.S. at 255.

**B. First Amendment**

**1. Commercial Speech**

For a statute limiting commercial speech that is neither misleading nor related to unlawful activity, (1) the state must assert a substantial interest justifying the restriction on commercial speech; (2) the restriction must directly advance the state interest involved; and (3) the restriction must not be more extensive than necessary to serve that interest. *Vanguard Outdoor, LLC v. Los Angeles*, 648 F.3d 737, 740 (9th Cir. 2011) (citing *Worldwide Rush, LLC v. Los Angeles*, 606 F.3d 676, 684 (9th Cir. 2010)); *see also Central Hudson Gas & Elec. Corp. v. Public Service Comm. of N.Y.*, 447 U.S. 557 (1980).

"A regulation may have exceptions that undermine and counteract the interest the government claims it adopted the law to further," but the exceptions cannot so undermine the stated interests so as to render the ban unconstitutionally underinclusive. *Vanguard Outdoor*, 648 F.3d at 741. In *Worldwide Rush*, "[t]he court urged judicial deference to a 'municipality's reasonably graduated response to different aspects of a problem' and directed that a 'holistic' approach must be taken when assessing exceptions to the ban, rather than looking at each exception in isolation." *Vanguard Outdoor*, 648 F.3d at 741 (quoting *Worldwide Rush*, 606 F.3d

– 7 –

1    at 685).

2         The Court in *Vanguard Outdoor* considered the earlier case of *Metro Lights,*

3    *LLC v. Los Angeles*, 551 F.3d 898 (9th Cir. 2009).  In that case, the Court concluded

4    that in two instances, exceptions render a regulation unconstitutional:  (1) when the

5    exception ensures that the regulation will fail to achieve its stated purpose or (2) when

6    the exceptions make distinctions among different kinds of speech that do not relate

7    to the interest the government seeks to advance.  *Vanguard Outdoor*, 648 F.3d at 742

8    (citing *Metro Lights*, 551 F.3d at 906.)

9         Plaintiff argues that *Vanguard Outdoor* has been effectively overruled by *Reed*

10   *v. Gilbert*, __U.S.__, 135 S. Ct. 2218 (2015).  In *Reed*, The Court looked at a sign

11   ordinance that prohibited signs without a permit but exempted 23 different categories

12   of signs, providing different rules for each exemption depending on the content of the

13   sign.  For example, "political signs" trying to influence the outcome of the election

14   had different requirements than "ideological signs" communicating a message or idea

15   or than "temporary directional signs" directing the public to a church or other

16   qualifying event.  Justice Thomas, joined by Justices Roberts and Scalia, held this

17   ordinance regulated speech based on its content and was thus subject to a strict

18   scrutiny analysis.  *Id.* at 2228.  The Town's sign ordinance, because it imposed a

19   content-based restriction on speech, could "stand only if [the restrictions] survive

20   strict scrutiny which requires the Government to prove that the restriction furthers a

21   compelling interest and is narrowly tailored to achieve that interest."  *Id.* at 2231.

22        The six remaining justices filed concurring opinions expressing concern that

23   the majority opinion would be used to invalidate all sign ordinances that contain

24   exemptions for helpful signs.  Justice Alito, joined by Justices Kennedy and

25   Sotomayor attempted to catalogue municipal ordinance distinctions that would not be

26   content based, specifically listing ordinances distinguishing between off-premises

27   and on-premises signs.  *Id.* at 2233.  Justice Kagan, joined by Justices Ginsburg and

28   Breyer, expressed concern that courts looking at sign ordinances would be forced to

– 8 –

1   "water down strict scrutiny to something unrecognizable" and concluded there was

2   no need to apply strict scrutiny to every sign ordinance across the country, since the

3   ordinance at issue does not even pass the "laugh test." *Id.* at 2238.

4   In this case the stated purpose of the sign ordinance is to optimize

5   communication while protecting the aesthetic character of the City.   SDMC

6   §142.1201.  The City is thus asserting a substantial interest justifying restriction on

7   commercial speech.

8   The restrictions to advance this interest include: (1) the requirement that all

9   signs get a permit, and (2) only signs with on-premises or public interest messages

10   are allowed.  SDMC §142.1210(a)(1).  These restrictions directly advance the stated

11   interest.   On-premises messages communicate to the public the "establishment,

12   person, activity, goods, products or services located on the premises where the sign

13   is installed."  SDMC §142.1210(a)(1)(A).  Thus, communication is optimized, while

14   limiting outside off-premises advertising to protect the aesthetic character of the City.

15   "Public interest messages" include (1) "official signs and notices, including

16   historical markers and commemorative plaques," (2) signs and notices identifying

17   "nonprofit service clubs, religious organizations or charitable associations" and

18   containing information relating to those organizations' activities,  and (3) "political

19   or ideological signs" related either to a local election issue or candidate or expressing

20   ideological or political views.  SDMC §142.1210(a)(1)(B).  Again, the regulation

21   provides for optimizing communication while protecting the aesthetic character of

22   the City.

23   Finally, the restrictions are not more extensive than necessary to serve that

24   interest.  Therefore, the Court finds the *Central Hudson* requirements are met in this

25   case.

26   Plaintiff raises concern about three exceptions to the sign ordinance and argues

27   they fail to meet the "strict scrutiny" required under *Reed:* (1) the mural exception,

28   (2) the off-premises versus on-premises distinction, and (3) the exception for public

– 9 –

1  interest messages.

2      First, Plaintiff argues that the mural exception is confusing and negates the

3  stated purpose of the ordinance.  The mural exception applies to art work that does

4  not contain "copy, advertising symbols, lettering, [or] trademarks."   SDMC

5  §142.1210(a)(3).  To the extent the stated purpose is to protect the aesthetic character

6  of the City, the Court finds exempting art work that does not contain advertising copy

7  enhances and does not negate the purpose of the regulation.  Nor is *Reed* applicable

8  since the exception is not distinguishing between speakers but distinguishing art work

9  from signs containing speech.

10      Furthermore, the distinction drawn in the sign ordinance between "on-

11  premises" and "off-premises" messages does not run afoul of *Reed.* As discussed in

12  the concurring opinion, this distinction is not content based and, therefore, is still

13  permissible.  *See Reed,* 135 S. Ct. at 2233.

14      Finally, the ordinance provides an exception for public interest messages,

15  defined as: (1) "official signs and notices, including historical markers and

16  commemorative plaques," (2) signs and notices identifying "nonprofit service clubs,

17  religious organizations or charitable associations" and containing information

18  relating to those organizations' activities,  and (3) "political or ideological signs"

19  related either to a local election issue or candidate or expressing ideological or

20  political views.  SDMC §142.1210(a)(1)(B).  Even assuming *Reed* now requires that

21  this distinction between advertising and public interest messages requires strict

22  scrutiny, this Court find the burden has been met.  The differentiation between

23  advertising signs and public interest messages furthers a compelling governmental

24  interest and is sufficiently tailored to accomplish that interest.

25      Therefore, the Court finds the sign ordinance constitutionally limits

26  commercial speech.

27  **2. Vagueness**

28      "A statute must be sufficiently clear so as to allow persons of ordinary

– 10 –

intelligence a reasonable opportunity to know what is prohibited." *Humanitarian Law Project v. U.S. Treasury Dept.*, 578 F.3d 1133, 1146 (9th Cir. 2009) (quotations omitted). Statutes that are insufficiently clear pose three problems: (1) they punish people "for behavior they could not have known was illegal"; (2) they lead to "subjective enforcement of the laws"; and (3) they create a "chilling effect on the exercise of First Amendment freedoms." *Id.* "A statute's vagueness exceeds constitutional limits if its deterrent effect on legitimate expression is . . . both real and substantial, and if the statute is [not] readily subject to a narrowing construction by the state courts." *California Teachers Ass'n v. State Bd. of Educ.*, 271 F.3d 1141, 1150 (9th Cir. 2001) (quotations omitted). "Whether a statute's chilling effect on legitimate speech is substantial should be judged in relation to what the statute clearly proscribes." *Id.*

Challenges to a statute for vagueness can be either a facial challenge or an "as applied" challenge. "Facial invalidation is, manifestly, strong medicine that has been employed by the court sparingly and only as a last resort." *California Teachers Ass'n*, 271 F.3d at 1155 (quoting *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 580 (1998)). A facial challenge for vagueness will be denied "so long as it is clear what the statute proscribes in the vast majority of its intended applications." *California Teachers Ass'n*, 271 F.3d at 1147. "Condemned to the use of words, we can never expect mathematical certainty from our language." *Humanitarian Law Project*, 578 F.3d at 1147 (quoting *Grayned v. Rockford*, 408 U.S. 104, 110 (1972)).

With respect to an "as applied" challenge for vagueness, someone to whose conduct a statute clearly applies, will not be successful. *Humanitarian Law Project*, 578 F.3d at 1148; *see also Hunt v. Los Angeles*, 638 F.3d 703, 710 (9th Cir. 2011) ("[A] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others.") California's void for vagueness doctrine is substantially similar. *See e.g.*, *In re Perdue,* 221 Cal. App. 4th 1070, 1077 (2013) (citing *Burg v. Municipal Court*, 35

– 11 –

1 | Cal. 3d 257, 269 (1983)); *Edwards v. Swarthout*, No. 10-cv-4923, 2012 U.S. Dist.
2 | LEXIS 84329, at *23-25 (N.D. Cal. June 18, 2012).

3 | Facially, the Court certainly recognizes that the sign ordinance at issue is far
4 | from a paragon of clarity.  As discussed at oral argument, the morass of modifying
5 | clauses makes the statute needlessly complicated.  With that said, the Court turns
6 | individually to the three objected to provisions and addresses each individually:  (1)
7 | the mural exception, (2) the definition of public interest messages, and (3) the
8 | definition of on-premises versus off-premises messages.

9 | **a.   Mural Exception**

10 | The ordinance has an exception for "[p]ainted graphics that are murals,
11 | mosaics, or any type of graphic arts that are painted on a wall or fence and do not
12 | contain copy, advertising symbols, lettering, trademarks, or other references to the
13 | premises, products or services that are provided on the premises where the graphics
14 | are located or any other premises." SDMC §142.1210(a)(3).  The exception, on its
15 | face, is not vague.  It applies to any painted graphics that do not contain advertising.
16 | Thus, any painted graphics with "copy, advertising symbols, lettering [or]
17 | trademarks" are not subject to this exception nor are any painted graphics that
18 | reference businesses, products or services provided either on or off the premises
19 | where the graphics are located.  Since it is clear that the exception applies to painted
20 | artwork that does not contain copy, advertising symbols, lettering, trademarks or
21 | references to any premises, goods or services, in the vast majority of its intended
22 | applications, the statute is clear and the facial challenge to vagueness is denied.

23 | With respect to the Plaintiff's "as applied" challenge, all of her "murals" at
24 | issue are clearly advertising.  They all contain copy, advertising symbols, lettering,
25 | and/or trademarks.  Since her signs were clearly not murals as defined by the statute,
26 | she cannot complain that the statute was vague as applied to her.

27 | Plaintiff raises an issue with respect to her "Discover L.A." sign.  This sign
28 | was permitted once the words were painted out.  (Frostrom Decl., Exh. I, ECF No.

– 12 –

1   21-3.)  This appears in keeping with the statute which allows art work without
2   "lettering."  Although Plaintiff may have painted other similar signs that were not
3   cited, advertising San Diego and Pacific Beach, she fails to show that this was
4   anything more than lax enforcement.

5           **b.**      **Public Interest Messages**

6         The City will issue permits for signs containing "public interest messages"
7   defined as: (1) "official signs and notices, including historical markers and
8   commemorative plaques," (2) signs and notices identifying "nonprofit service clubs,
9   religious organizations or charitable associations" and containing information
10  relating to those organizations activities; and (3) "political or ideological signs"
11  related either to a local election issue or candidate or expressing ideological or
12  political views.  SDMC §142.1210(a)(1)(B).  While there may be some signs for
13  which this application may be unclear (for example, an advertisement for a product
14  that urges voters to vote a particular way on a proposition), the statute is clear for the
15  "vast majority of its intended applications" and none of Plaintiff's signs are
16  potentially in this gray area. *California Teachers Ass'n*, 271 F.3d at 1147.  Therefore,
17  the Court finds this phrase is not unconstitutionally vague.

18          **c.**      **On-Premises versus Off-Premises**

19        The City will issue permits for signs that contain "on-premises" messages
20  defined as "those identifying or advertising an establishment, person, activity, goods,
21  products, or services located on the premises where the sign is installed."  SDMC
22  §142.1210(a)(1)(A).  Although use of the word "located" as opposed to "sold" or
23  "provided" may be slightly confusing, the purpose of this sign ordinance makes it
24  clear that this section is designed to "optimize communication" for the general public
25  and thus to inform them if an "establishment, person, activity, goods, product or
26  service" is located on the premises where the sign appears.  Again, although there
27  may be a very narrow category of cases where application of the ordinance is unclear
28  (Plaintiff raises the specter of a sign for Michelob Ultra, where a single bottle of this

– 13 –

beer is located in an apartment in the building), in the vast majority of cases it is clear that this applies to signs advertising or notifying the public that the product in the sign is being sold on-premises.  Again, Plaintiff's proposed signs do not fall into the area where the statute may be unclear, therefore, the statute is not unconstitutionally vague.[4]

### 3.  Unbridled Discretion/ Prior Restraint

"[W]hen a licensing statute vests unbridled discretion in a government official over whether to permit or deny expressive activity," it is "void on its face."  *Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 755–56 (1988) (quoting *Lovell v. Griffin*, 303 U.S. 444, 452–53 (1938)).  "[I]n the area of free expression a licensing statute placing unbridled discretion in the hands of a government official or agency constitutes a prior restraint and may result in censorship."  *Id.* at 757 (citations omitted).  It allows the government "substantial power to discriminate based on the content or viewpoint of speech by suppressing disfavored speech or disliked speakers."  *Id.* at 759.

"A person subject to a restraint ordinance may make a facial, First Amendment attack on that ordinance without ever applying for a permit because the threat of the prior restraint itself constitutes an actual injury."  *Get Outdoors II v. San Diego*, 506 F.3d 886, 894 (9th Cir. 2007).  A "prior restraint" exists when: (1) the ordinance vests unbridled discretion in the licensor; or (2) the ordinance does not impose adequate time limits on the relevant public officials.  *Id.*

The Court examines the totality of circumstances, including whether the statute contains "narrow, objective, and definite standards" to guide the official's decision;

---

[4] To the extent Plaintiff argues that her signs *were* on-premises advertising, as, for example, where she painted a Jack Daniels sign on a building in which a bar that might be selling Jack Daniels was located, the proper recourse is for her to either appeal the citation or the denial of a permit and provide proof to the Administrative Hearing Officer, or ultimately the Superior Court, that she was wrongfully cited or wrongfully denied the permit when in fact she had painted an on-premises sign.

– 14 –

whether there is a right to appeal or seek review; and whether the official is required to give an explanation of the decision.  *Seattle Affiliate of Oct. 22nd Coalition to Stop Police Brutality v. Seattle*, 550 F.3d 788, 798–99 (9th Cir. 2008); *Desert Outdoor Advertising v. Moreno Valley*, 103 F.3d 814, 818 (9th Cir. 1996), cert. denied 522 U.S. 912 (1997).

In *Get Outdoors II,* the Ninth Circuit concluded that because the sign permits at issue were denied on grounds that were constitutionally valid and neither plaintiff's filings nor activities evinced any intent to file permit applications that complied with these requirements, plaintiff could not show it would ever be genuinely threatened by an unconstitutional prior restraint on speech, and thus, the challenge to the ordinance on this ground was denied.  506 F.3d at 895.

Plaintiff argues in this case that City employees have unbridled discretion whether to enforce the sign ordinance and what penalties to impose.  As discussed above, the statute provides City employees with "narrow, objective and definite standards" to guide the employee's decision.  Enforcement of the sign ordinance is complaint-driven.  (Richmond Decl. ¶6.)[5]

"[V]oluntary compliance [with the sign ordinance] is the primary goal of the City's Code Enforcement Division (CED)."  (Richmond Decl. ¶5.)  Once a complaint

---

[5] AArt objects to Richmond's Declaration as well as the Code Enforcement Division (CED) procedures manuals attached to his Declaration (ECF No. 53.)  AArt argues that his Declaration and the CED manuals are based on new rules that came into effect in 2016 and neither of these procedure manuals were produced in discovery.  The Court agrees that Exhibit A, which purports to be a procedure manual that came into effect in 2016, has marginal relevance to this case.  However, Richmond's Declaration does not appear to be based solely on rules that were passed in 2016.  Therefore, the Court will overrule the objection but will give limited weight to any rules that appear to be recently enacted.  With respect to the discovery violation objection, Plaintiff attaches its Requests for Production in which it requested "[a]ll documents providing standards, guidance, policies, or criteria" as to what constitutes a "sign," a "mural," and "on-premises messages" under the sign ordinance.  (ECF No. 53-1, Exh. BBBBB.)  The CED procedure manual attached to Richmond's Declaration does not appear responsive to this Request.  Instead, the procedure manual addresses when and how a party should be cited for violations of city codes.  Since there does not appear to be a discovery violation, Plaintiff's objection on this ground is also overruled.

– 15 –

1    is received, the CED mails a voluntary compliance letter to the violator or assigns a

2    CED investigator to investigate the complaint.   (Richmond Decl. ¶6.)   The

3    investigator may contact the violator, inspect the property, issue an Administrative

4    Citation Warning "for a minor violation," issue a $100 to $1000 administrative

5    citation, or refer the case to the City Attorney.  (*Id*. ¶8.)  The CED investigator does

6    have guidance as to what varying levels of punishment should be imposed and is to

7    take into consideration: (1) the nature of the violation, (2) the seriousness of the

8    violation, (3) the duration of the violation, (4) the efforts of the violator to correct the

9    violation, (5) the impact of the violation on the community, (6) past violations by this

10   violator, (7) the violator's good faith effort to comply with the sign ordinance, (8) the

11   economic impact or a penalty on the violator, (9) whether the violation is easy to

12   correct, and (10) "any other factors that justice may require."  (*Id*. ¶9.)

13          If a violator feels the citation has been improperly given, she has a right to

14   appeal. *See* ECF No. 21-9 p. 28 (back of citation showing right to appeal to the

15   Administrative Hearing Coordinator); SDMC §§ 12.501-.502, 12.0401-.0413, Cal.

16   Civ. Proc. §1094.6.

17          Looking at the totality of the circumstances, City employees are not given

18   unbridled discretion on when or how to enforce the sign ordinance. Thus, Plaintiff's

19   challenge to the ordinance on this ground fails.

20          **C.  Equal Protection**

21          Plaintiff argues that selective enforcement of the sign ordinance, that is,

22   declining to enforce it against Comic-Con approved artists but enforcing it against

23   her for the same signs, results in a violation of the Equal Protection Clause of the

24   Fourteenth Amendment.   "The Equal Protection Clause of the Fourteenth

25   Amendment commands that no State shall 'deny to any person within its jurisdiction

26   the equal protection of the laws,' which is essentially a direction that all persons

27   similarly situated should be treated alike." *City of Cleburne, Texas v. Cleburne*

28   *Living Center*, 473 U.S. 432, 439 (1985).  "The Equal Protection Clause of the

– 16 –

California Constitution similarly states that a person may not be denied equal protection of laws (Cal. Const. art 1, §7), and statutory classifications challenged thereunder are analyzed by the same rules applicable to challenges under the Fourteenth Amendment." *Bernardo v. Planned Parenthood Fed'n of America*, 115 Cal. App. 4th 322, 365 (2004).

In this case Plaintiff cites no statute that overtly distinguishes between Comic-Con sign painters and AArt. Instead, Plaintiff argues that the sign ordinance was selectively enforced against her while Comic-Con sign painters were not required to get permits and were not cited.

To succeed on a selective enforcement claim under the Equal Protection Clause of the Fourteenth Amendment, "a plaintiff must demonstrate that enforcement had a discriminatory effect and [that those enforcing the statute] were motivated by a discriminatory purpose." *Lacey v. Maricopa County*, 693 F.3d 896, 920 (9th Cir. 2012) (quotations omitted). "Discriminatory effect" requires a showing that others similarly situated were not prosecuted. *Id.* Plaintiff must "identify a similarly situated class against which the plaintiff's class can be compared." *Freeman v. Santa Ana*, 68 F.3d 1180, 1187 (9th Cir. 1995). "Discriminatory purpose" requires that plaintiff show the City decided to enforce the law against plaintiff "on the basis of an impermissible ground such as race, religion or exercise of . . . constitutional rights." *Lacey*, 693 F.3d at 922.

Plaintiff fails to show either "discriminatory effect" or "discriminatory purpose." Plaintiff does demonstrate that, during Comic-Con, several large signs appeared that were in violation of the San Diego sign ordinance. (Declaration of Pamela Anderson, ECF No. 51-18, ¶¶ 4–6.) However, Plaintiff fails to establish that these signs were on City, as opposed to Port Commission property. Certainly, some of the signs she complains of—such as signs on the Convention Center or on the Marriott—were on Port Commission property and thus not under the bailiwick of the City. Furthermore, Plaintiff fails to show that the unpermitted signs were somehow

1   approved by (or paid money to) Comic-Con.   Therefore, AArt fails to show a
2   similarly-situated class against which her class can be compared.   Finally, and
3   perhaps most importantly, Plaintiff fails to establish that any signs that were on City
4   property were not cited.  As pointed out by the City in oral argument, some businesses
5   make the economic decision to pay City fines and ignore the ordinance.  Plaintiff fails
6   to demonstrate a "discriminatory effect."

7      Additionally, Plaintiff fails to show that the City had a "discriminatory
8   purpose" to the extent it failed to enforce the ordinance.  The City freely admits that
9   enforcement of the sign ordinance is complaint-driven, and it is possible Comic-Con,
10  in order to discourage competitors, reports violations of the sign ordinance to the
11  City.  But this does not mean the City acts with the discriminatory purpose necessary
12  to prove selective enforcement.

13     There is simply no potentially admissible evidence to support Plaintiff's theory
14  that the City allowed Comic-Con to institute a "pay to play" scheme, requiring sign
15  displayers to pay Comic-Con to avoid the City's enforcement. Plaintiff cites several
16  inadmissible hearsay statements to support this theory including:  a statement by
17  David   Glanzer   ostensibly   made   in   an   interview   and   posted   on
18  comicbookresources.com, an email statement from Dan Christensen at Launch Point
19  Marketing, and an email from Ms. Anderson to Damien at Comic-Con purporting to
20  summarize a telephone conversation she had with him.  None of these statements is
21  potentially admissible.  *See* Fed. R. Civ. P. 56(c)(2) ("A party may object that the
22  material cited to support or dispute a fact cannot be presented in a form that would
23  be admissible in evidence."). And, more importantly, none supports her theory that
24  the City allowed Comic-Con to force individuals to pay for the benefit of avoiding
25  City code enforcement.

26     Since no genuine issue of fact exists for trial, and Plaintiff has failed to make
27  a  showing  sufficient  to  establish  the  elements  necessary  to  prove  selective
28  enforcement,  the  City's  Motion  for  Summary  Judgment  on  this  ground  is

– 18 –

1  GRANTED.

2      **D.  Due Process**

3          "Procedural due process imposes constraint on governmental decisions which

4  deprive individuals of 'liberty' or 'property' interests within the meaning of the Due

5  Process Clause of the Fifth or Fourteenth Amendment."  *Mathews v. Eldridge*, 424

6  U.S. 319, 332 (1976).  In order to comply with due process, the City must hold "some

7  form of hearing" "before an individual is finally deprived of a property interest."  *Id.*

8  The hearing must be held at a meaningful time and in a meaningful manner, but the

9  requirements for the hearing are flexible and depend on the particular situation.  *Id.*

10  at 334.  In determining whether the hearing process complies with due process the

11  Court should consider: (1) the private interest that will be affected by the

12  government's action, the risk of erroneous deprivation of such interest through the

13  procedures used, the probable value, if any, of additional or different procedural

14  safeguards and, finally, the City's interest, including the function involved and the

15  fiscal and administrative burden that the additional or different procedural

16  requirement would entail. *Id.*

17          In this case, Plaintiff was deprived of the use of her property interest when the

18  City denied her permits for her signs. However, the Municipal Code sets out an

19  appellate process for both a citation and the denial of a permit.  SDMC §§12.0501-

20  0502, 12.0401-0413, 129.0809.  Furthermore, if an individual is dissatisfied with the

21  results of the Administrative Hearing, he or she may then appeal to the San Diego

22  Superior Court.  Cal. Civ. Proc. §§1094.6, 1094.8.  These procedures adequately

23  comply with due process.

24          Citing *Agnew v. Culver City*, 147 Cal. App. 2d 144, 304 P. 2d 788 (1956),

25  Plaintiff argues that the City improperly delegates all decisions regarding sign

26  ordinance enforcement to Civic San Diego.  *Agnew* stands for the proposition that the

27  City cannot delegate to an administrative board or officer the power to determine

28  what acts or omissions fall within a City ordinance and are unlawful.  Such a

1   delegation results in the administrative board or officer in effect passing laws and
2   constitutes an improper delegation of legislative power. *Id.* at 153. "An attempted
3   delegation of power to an officer…where no standards are established by which the
4   officer shall be governed in his actions, is in effect an attempted delegation to such
5   officer to enact a law." *Id.*

6        In this case, there is no evidence that the City delegated to Civic San Diego the
7   power to propound or issue regulations defining when the sign ordinance is violated.
8   In fact, there are no regulations defining the ordinance. The ordinance stands on its
9   own, and, since the Court has found that its wording is not vague, the fact that Civic
10  San Diego weighs in on whether a mural constitutes advertising or a public interest
11  message as defined by the ordinance is not an improper delegation of legislative
12  power.

13       **E.  Intentional Interference with Prospective Economic Advantage**

14       Plaintiff's last cause of action is for intentional interference with prospective
15  economic advantage. This California tort action is based on allegations that the City
16  was aware that Plaintiff had contracts to paint wall murals, but engaged in conduct to
17  disrupt those contracts. In order to prove this cause of action, plaintiff must show:
18  (1) an existing economic relationship; (2) containing a probable future benefit; (3)
19  that the defendant knew about; (4) intentional interference; and (5) resulting damages.
20  *Weiss v. Marcus*, 51 Cal. App. 3d 590, 600–01 (1975). In order to show that
21  defendant "intentionally interfered," Plaintiff must plead and prove that Defendant
22  engaged in conduct that was "wrongful by some legal measure other than the fact of
23  the interference itself." *Marin Tug & Barge, Inc. v. Westport Petroleum, Inc.*, 271
24  F.3d 825, 831 (9th Cir. 2001).

25       As discussed above, Plaintiff fails to show that the City engaged in any
26  wrongful conduct. Therefore, this final cause of action must fail as well.

27  **III.   CONCLUSION**

28       For the reasons stated above, the Court **GRANTS** the City's Motion for

– 20 –

1  Summary Judgment.  (ECF No. 20.)  Judgment is entered in favor of the City and

2  against AArt.

3         **IT IS SO ORDERED**.

4  **DATED:  January 6, 2017**

5

6  **Hon. Cynthia Bashant**
   **United States District Judge**

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

15cv1592